**The court incorporates by reference in this paragraph and adopts as the findings and analysis of this court the document set forth below. This document has been entered electronically in the record of the United States Bankruptcy Court for the Northern District of Ohio.**



Mary Ann Whipple
United States Bankruptcy Judge

**Dated: June 25 2007**

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | Case No. 07-31798 |
| | ) | |
| L & M Video Productions, Inc., | ) | Chapter 11 |
| | ) | |
| | ) | |
| Debtor. | ) | JUDGE MARY ANN WHIPPLE |

### MEMORANDUM OF DECISION GRANTING MOTION TO ABSTAIN

This case is before the court after an evidentiary hearing on a Motion to Dismiss or Abstain [Doc. # 8] filed by shareholder/creditor/asset purchaser Cornerstone Church, Inc. ("Cornerstone"). Cornerstone asks the court to dismiss the case for cause under 11 U.S.C. § 1112(b) or, alternatively, to abstain from exercising jurisdiction pursuant to 11 U.S.C. § 305(a). At the hearing, both Cornerstone and Debtor had the opportunity to, and did, present testimony and evidence in support of their positions.

This memorandum of decision constitutes the court's findings of fact and conclusions of law under Fed. R. Civ. P. 52, made applicable to this contested matter by Fed. R. Bankr. P. 9014 and 7052. Regardless of whether specifically referred to in this decision, the court has examined the submitted materials, weighed the credibility of the witnesses, considered all of the evidence, and reviewed the entire record of the case. Based upon that review, and for the reasons that follow, the court will grant Cornerstone's motion to abstain pursuant to § 305(a).

### FACTUAL BACKGROUND

This case follows two previously dismissed Chapter 11 cases filed by Debtor within the past twelve

months. Cornerstone also filed motions to dismiss or abstain in the prior two cases. The first case was filed on May 19, 2006, and was dismissed on July 10, 2006, due to a lack of corporate authority to file a bankruptcy petition. The second case was filed less than four months later on October 30, 2006, and was dismissed for cause under § 1112(b) on March 30, 2007. This case was filed just five weeks later on May 3, 2007.

In the opinion dismissing Debtor's first Chapter 11 case, the court set forth the following factual background of Debtor's corporate structure and its relationship with Cornerstone and made the following relevant findings:

Debtor is an Ohio corporation that operates a low power television broadcasting station under a license from the Federal Communications Commission ("FCC"). At the time Debtor filed its Chapter 11 petition, the corporation had two shareholders, Cornerstone Church, Inc., ("Cornerstone"), which holds 37% of the common stock, and L&M Broadcasting, Inc., which holds 63% of the common stock. Lamaree Miller ("Miller") and his wife, Linda Miller, own 100% of the stock in L&M Broadcasting, Inc. Miller organized the Debtor corporation in 1995, was Debtor's president until September 2003, and has managed the television station at all relevant times.

As early as 1997, Miller approached Robert Pitts, Vice President of Cornerstone, and requested that Cornerstone provide Debtor with operating capital in the form of a $20,000 loan. He repeated his request several times and Cornerstone loaned Debtor the money each time. Miller explained to Pitts that Debtor's individual shareholders were an obstacle in that they were not willing to invest any additional money in the business. Therefore, over the next few years, Cornerstone purchased all of the shares in Debtor except for those owned by L&M Broadcasting, Inc.

In 2003, after learning of a pending sale of Debtor, Cornerstone filed a motion for temporary restraining order in state court. The state action was settled pursuant to an agreement entered into between Cornerstone, Debtor, L&M Broadcasting, Inc., and Lamaree and Linda Miller on September 11, 2003 ("Settlement Agreement"). The Settlement Agreement recognizes Cornerstone's 37% interest in Debtor and required the parties to enter into a close corporation agreement with respect to Debtor. The Settlement Agreement also recognized that Cornerstone is a creditor of Debtor and required Debtor to execute an open-end note that includes all loans made by Cornerstone to Debtor and is secured by all of the assets of Debtor.[1]

The parties entered into the Close Corporation Agreement ("the Agreement") on September 16, 2003. Although Miller and his wife continued to be employed by Debtor, the Agreement removed Miller as Debtor's President and placed certain restrictions on him with

---

[1] Although the Settlement Agreement provides that the note will be secured by all of the assets of Debtor, including its FCC broadcast license, a broadcast license "is not an owned asset or vested property interest so as to be subject to a mortgage, lien, pledge, attachment, seizure, or similar property right." *Stephens Indus., Inc. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986).

2

respect to the company and its finances.[2]  The Agreement also provided that the Board of Directors shall be composed of six members, four of whom shall be designated by Cornerstone and two by L&M Broadcasting, Inc. [Paragraph 1 of] the Agreement further provides as follows:

> **The parties hereto agree that this Agreement is subject to the approval of the FCC.  Paragraph 5 below empowers Cornerstone to name a majority of the members of the Board of Directors of the Company and thus constitutes a transfer of control.  The parties hereby agree that this transfer of control shall be effective only upon receipt of approval of this Agreement from the FCC.**  In the event approval from the FCC has not been received within two hundred and seventy (270) days from the date of this Agreement either shareholder shall have the option to terminate this Agreement by providing written notice of termination to the other parties.

Under the Agreement, Debtor's shareholders also adopted amended Articles of Incorporation and an Amended and Restated Code of Regulations (the "Regulations").
. . . .

In accordance with the Regulations, Pitts became an elected member of Debtor's Board of Directors [on] September 16, 2003. The only other members of the Board of Directors are Miller and his wife, Linda.  Also on September 16, 2003, . . . Pitts was elected as Debtor's President. [Debtor Ex. GG].

Approval of the transfer of control of Debtor was not received within the 270 day period set forth in the Close Corporation Agreement . . . .  On January 26, 2005, Cornerstone provided written notice to Debtor, shareholder L&M Broadcasting, Inc., and the Millers of its election to terminate the Agreement pursuant to paragraph one of the Agreement.

On January 10, 2005, Teletech, the lessor of a transmitter used by Debtor, having not been paid under its lease and having received a money judgment against Debtor, filed a state court action against Debtor seeking the appointment of a receiver to enforce the judgment. Cornerstone was  joined in that action as a party defendant and also filed a cross-claim against Debtor, upon which it received a  judgment of more than $650,000.  By agreed order entered on February 16, 2005, the state court appointed  Ralph DeNune as receiver. The order appointing DeNune was approved by, among others, attorneys for Cornerstone, Debtor and the Millers.

DeNune entered into a purchase agreement with Cornerstone for its acquisition of all of Debtor's assets, including the FCC license.  Beyond the satisfaction of the claims of certain other creditors, the consideration  for the sale essentially consists of Debtor's existing debt to Cornerstone. Unsecured creditors were not generally given notice of or the opportunity to participate in the state court proceedings, and will not be paid anything through the receivership. On October 18, 2005, the state court confirmed DeNune's sale of

---

[2]  Specifically, the Close Corporation Agreement provided that Miller was not permitted "to borrow funds on behalf of the Company, negotiate checks or withdraw funds from the bank accounts of the Company or enter into contracts on behalf of the Corporation without the specific prior written consent of the President or the Board of Directors."

3

Debtor's assets to Cornerstone.[3]  [At the time of the hearing on the motion to dismiss or abstain in Debtor's first Chapter 11 case,] the sale ha[d] not been completed because the FCC ha[d] not approved transfer of the license to Cornerstone, pending which the state court authorized Cornerstone to take control of the assets and operate the television station "subject to the supervision of the receiver."  The receivership action remains pending in state court.

[Case No. 06-31157, Doc. #30 (internal citations omitted)].

At the beginning of the receivership, DeNune and Miller agreed that Miller would continue as manager of Debtor's television station, which operated under the call letters WNGT.  On August 10, 2005, the FCC granted an application for the involuntary transfer of control of the license and station  to DeNune as Debtor's receiver, and Miller operated the station under DeNune's supervision.  Miller revealed to both DeNune and Cornerstone only two sources of revenue generated by the station.  This revenue fell short of Debtor's monthly break even point by between $5,500 and $6,000, which amount was made up by Cornerstone in the form of loans to the corporation.  Although DeNune authorized Miller to sell air time on WNGT, and Miller in fact sold air time on the station in addition to what he previously revealed, he did not turn over to DeNune the additional funds from those sales.  In July 2006, after DeNune became aware of this situation,  he removed Miller as manager and moved the station to another location.  Matrix Broadcast Group, Inc., a company owned by Cornerstone, took over management of the station subject to DeNune's control  and continues to operate the station under the new call letters WMNT.  [Case No. 06-33114, Doc. # 29, pp. 4-5].

In dismissing Debtor's second Chapter 11 case, the court found a continuing diminution of the estate and an absence of a reasonable likelihood of rehabilitation:

> The first element, a continuing diminution of the estate, can be  satisfied by showing that the debtor is incurring continuing losses or maintaining a negative cash flow position. *In re Schriock Const., Inc.*, 167 B.R. 569, 575 (Bankr. D.N.D. 1994).  Although only one monthly operating report has been filed by Debtor in this case, the undisputed evidence in this case is that Debtor has been unable to operate its television station without an infusion of funds on a monthly basis by Cornerstone since before the receivership commenced; and Debtor does not now contend that it has the funds to operate the station.  This negative cash flow and the debt that will continue to accrue in order to broadcast the television station satisfies the court that a continuing diminution of the estate exists.
>
> The court also finds an absence of a reasonable likelihood of rehabilitation.  Debtor's

---

[3] The state court confirmed the sale in the amount of $913,000, consideration for which consists in large part of Debtor's existing debt to Cornerstone.  In addition, Cornerstone  is responsible for paying the fees and costs of the receiver and has paid a debt owed by Debtor to Ultra Vision, who was also a secured creditor.

4

only prospect for rehabilitation or reorganization was based on finding someone willing to invest in the company in the form of either an infusion of new equity or of a sale of Debtor's assets in an amount greater than the purchase price by Cornerstone. Although at filing, as discussed above, potential investors expressed an interest in such an investment, that is no longer the case. And, although Miller believes the FCC license is more valuable than what is reflected by the sale agreement between Cornerstone and the receiver, after nearly five months, no other person, including any of Debtor's other creditors, have expressed a willingness to enter into an arrangement that would be more beneficial. Given Debtor's inability to operate its television station without the monthly infusion of funds from other sources and the lack of any likelihood of rehabilitation or reorganization within a reasonable time, the court will grant Cornerstone's motion to dismiss under § 1112(b).

[*Id.* at 9].

At the hearing on the motion to dismiss or abstain filed in this third Chapter 11 case, DeNune testified that at the time this case was filed, the FCC had not yet consented to assignment of the broadcast license to Cornerstone and, as a result, his sale of Debtor's assets had still not been completed. However, after the date of filing, on May 21, 2007, the FCC consented to assignment of the license to Matrix, Cornerstone's wholly-owned subsidiary.[4] [Cr. Ex. A]. Consummation of the assignment must be completed within ninety days of that date, and the assignee is not authorized to operate the station until notification of consummation has been sent to the FCC. [*Id.*]. Because this case was filed on May 3, 2007, consummation of the purchase agreement has not yet occurred. Nevertheless, the station continues to operate under an agreement between Matrix and DeNune, using equipment that is not owned by the receivership estate.

In February 2007, Miller and his wife, as members of Debtor's Board of Directors and after notice to Pitts, the only other board member at that time, held a meeting of the Board of Directors at which six additional members of the Board were elected, including Dr. Earl Murry.[5] Murry was also elected as Debtor's President. The six new Board members all come to the table with some degree of business experience and expertise. Cornerstone did not contest the validity of these corporate governance actions at the hearing.

Murry testified regarding steps the Board has taken since Debtor's second Chapter 11 case was dismissed. In addition to investigating the condition of the company, he testified that they have attempted to locate businesses willing to advertise with the station and have begun developing a business plan and

---

[4] In denying Miller's objection to the application to assign the license to Matrix, the FCC found that the record was clear that the agreement to purchase the station was assigned by Cornerstone to Matrix. [Cr. Ex. A, attached letter, p. 3].

[5] Although Miller and his wife remain as Board members, the record is not clear whether Pitts continues to be a member of the Board.

5

determining rates to be charged for future advertising. Murry admitted, however, that neither written commitments nor letters of intent by any advertiser have been actually obtained. He also testified that the Board has found two locations at which the station could possibly be operated and that Debtor could rent. In addition, three bank accounts have been opened in Debtor's name in which $100 has been deposited. He further testified that proceedings have been instituted in state court to challenge the receivership and the order approving sale of Debtor's assets. In addition, the Board has hired an attorney on behalf of Debtor to evaluate challenging the FCC's consent to the assignment of the broadcasting license to Matrix.

Murry testified that the six new members of Debtor's Board of Directors are committed to providing financing for Debtor's business operations for a period of one year, after which he believes the company will be operating at a profit. According to Murry, such financing would be in the form of loans to the company to be repaid only after all other creditors' claims are satisfied. When asked what amount the individual directors are willing to advance as financing, Murry responded, "Whatever it takes." As evidence of the directors' commitment, Murry testified that they have loaned Debtor between $50,000 and $75,000 to date, and no director has yet withdrawn. However, while the court finds Murry to be sincere in his commitment, he was the only Board member to testify and no written commitment or letter of intent was offered as evidence of any individual director's commitment to continue advancing funds to Debtor.

Finally, DeNune testified that on June 1, 2007, he was presented with three checks totaling $5,000 from Select Religious Broadcasting in payment of three invoices dated May 3, 2007, for advertising time on WNGT in February, March and April 2007, notwithstanding the fact that WNGT was no longer in operation during those months. Murry testified that the Board did not authorize this sale of time. Murry also testified that if control of the broadcasting license is returned to Debtor, Miller will have no managerial or financial responsibilities but will be employed only as an operations technician.

On its bankruptcy schedules, Debtor schedules total assets in the amount $1,917,750. Included in this list is the FCC broadcasting license valued at $1,800,00 and a customer list valued at $15,000. The remainder of the scheduled assets consists primarily of broadcast equipment that the receiver has had dismantled and is being held in storage. Debtor's schedules show that Cornerstone, its only secured creditor, holds a claim in the amount of $500,000[6] and that Debtor has unsecured nonpriority debt in the amount of $685,975.

---

[6] Although Debtor lists the secured debt owed to Cornerstone as $500,000, in fact, the state court judgment from which Debtor concedes it did not appeal is for an amount in excess of $650,000.

6

## LAW AND ANALYSIS

Cornerstone argues that this third case should be dismissed for cause under 11 U.S.C. § 1112(b) for the same reasons set forth in the court's opinion dismissing Debtor's second Chapter 11 case. Alternatively, Cornerstone argues that the court should abstain from exercising jurisdiction in this case under 11 U.S.C. § 305(a). For the reasons that follow, the court will grant Cornerstone's motion to abstain and will dismiss the case under § 305(a).

Section 305 provides in relevant part as follows:

(a) The court, after notice and a hearing, may dismiss a case under this title, or may suspend all proceedings in a case under this title, at any time if--

(1) the interests of creditors and the debtor would be better served by such dismissal or suspension . . . .

(c) An order under subsection (a) of this section dismissing a case or suspending all proceedings in a case, or a decision not so to dismiss or suspend, is not reviewable by appeal or otherwise by the court of appeals under section 158(d), 1291, or 1292 of title 28 or by the Supreme Court of the United States under section 1254 of title 28.

11 U.S.C. § 305(a) and (c).

"The decision to dismiss or suspend under § 305(a) is discretionary and must be made on a case-by-case basis." *In re Fortran Printing, Inc.*, 297 B.R. 89, 94 (Bankr. N.D. Ohio 2003). Because a court may abstain from exercising jurisdiction even when jurisdiction otherwise exists and because § 305(c) significantly limits appellate review of the court's decision to do so, such abstention "is an extraordinary remedy that should be used sparingly and not as a substitute for a motion to dismiss under other sections of the Bankruptcy Code." 2 Alan N. Resnick, et al., *Collier on Bankruptcy* ¶ 305.02 (15th ed. 2006); *see In re Fortran Printing, Inc.*, 297 B.R. at 94 ("The application of § 305(a) is an extraordinary remedy."). The test for dismissal under this section is "whether the requested relief would be in the 'best interests' of both the debtor *and* its creditors." *In re Schur Mgmt. Co.*, 323 B.R. 123, 129 (Bankr. S.D.N.Y. 2005). The burden of proof is on the party seeking abstention. *In re Sherwood Enterprises, Inc.*, 112 B.R. 165, 167 (Bankr. S.D. Tex. 1989).

In determining whether abstention would be in the best interests of the debtor and its creditors, courts have considered a number of factors, including: (1) economy and efficiency of administration; (2) whether another forum is available to protect the interests of both parties or there is already a pending proceeding in state court; (3) whether federal proceedings are necessary to reach a just and equitable solution; (4) whether there is an alternative means of achieving an equitable distribution of assets; (5)

7

whether the debtor and the creditors are able to work out a less expensive out-of-court arrangement which better serves all interests in the case; (6) whether a non-federal insolvency has proceeded so far in those proceedings that it would be costly and time consuming to start afresh with the federal bankruptcy process; and (7) the purpose for which bankruptcy jurisdiction has been sought. *See, e.g., In re Fortran Printing, Inc.*, 297 B.R. at 94-95; *In re 801 South Wells St. Ltd. P'ship*, 192 B.R. 718, 723 (Bankr. N.D. Ill. 1996).

In this case, a state court receivership has now been pending for over two years. In that proceeding, the state court entered a money judgment in favor of Cornerstone for the debt owed it by Debtor. That judgment remains in effect. The state court has also entered an order confirming the sale of Debtor's assets to Cornerstone and, with the recent FCC consent to the assignment of the broadcast license to Cornerstone's assignee, all contingencies to consummating the state court receiver's sale have now been satisfied. But for Debtor filing this Chapter 11 case, the state court sale would have been completed and the receivership concluded. Debtor firmly believes the terms of the state court sale to be unfair in among other aspects allowing Cornerstone to essentially bid in debt to acquire assets upon which it arguably does not even have an enforceable security interest. However, neither Debtor nor any other party in interest appealed the state court order confirming DeNune's sale. *See Mandalaywala v. Zaleski*, 124 Ohio App. 3d 321 (Ohio Ct. App. 1997)(an order confirming a sale by a receiver is a final appealable order).

At the hearing on Cornerstone's motion, Debtor argued that the state court receivership proceeding and the state court orders confirming the sale of assets and determining the amount owed by Debtor to Cornerstone are the result of a fraud upon the state court. Debtor does not, quite properly, ask this court to review these state court decisions. Instead Debtor has instituted proceedings in state court to challenge the receivership and the state court orders. Debtor is also evaluating pursuit of an administrative challenge to the FCC's consent to assignment of the broadcast license to Matrix. At the hearing, Debtor explained that the state court and FCC proceedings will go forward independently of this bankruptcy case and, meanwhile, that the television station will continue to be operated by Matrix under the supervision of DeNune unless and until the FCC rules in Debtor's favor. In response to the court's question regarding what will happen in this case if the court exercises jurisdiction and permits the case to go forward, Debtor stated that it would (1) pursue in the FCC proceeding control over broadcasting under the FCC license, (2) pursue post-judgment relief in state court, (3) determine whether any entity can be sued for violating rights of the corporation so that there is a recovery for the corporation, and (4) determine how to set up and prepare to begin broadcasting in the event the FCC and the state court rule in Debtor's favor. Debtor argued that Chapter 11 is a necessary predicate to proceeding in the other forums with the imprimatur of status as a

debtor-in-possession and to shed the accountability or blame for any wrongdoings of and failure to act by Miller.

In *In re Duratech Industries, Inc.*, 241 B.R. 283 (E.D.N.Y. 1999), the court affirmed the decision of the bankruptcy court to abstain under § 305(a) where the debtor was involved in civil litigation pending in state court and the success or failure of its Chapter 11 case depended upon the outcome of that litigation. *Id.* at 287; *see also In re Schur Mgmt. Co.*, 323 B.R at 127(dismissing case where debtors had only "the mere possibility of a future need to file"); *In re 801 South Wells St. Ltd. P'ship*, 192 B.R. at 724 (citing cases and observing that "[b]ankruptcy courts have determined that alternative forums exist when a matter is pending in state court which will affect whether the bankruptcy reorganization is necessary"). Courts have also found abstention appropriate where the debtor did not file its petition to reorganize but rather as a litigation tactic. *See In re Nahas*, 95 B.R. 387 (Bankr. W.D. Pa. 1989) (finding abstention appropriate where the debtors had moved in state court to reopen a state court judgment, the debtors could not reorganize unless the judgment was vacated due to an inability to fund a plan, and the debtors had filed their bankruptcy petition as a litigation tactic in order to defeat state requirements for supersedeas bonds); *see also In re First Fin'l Enter., Inc.*, 99 B.R. 751, 754 (Bankr. W.D. Tex. 1989) (finding abstention proper in a case in which Chapter 11 is used purely as a litigation strategy). And courts have found abstention proper "where considerations of comity with state and federal administrative proceedings would dictate that the Bankruptcy Court stay its hand in order to prevent undue interference or entanglement with state or federal administrative and regulatory schemes." *Id.* (citing cases)

In this case, Debtor seeks to use the safe haven of Chapter 11 as a litigation platform to legitimize arguments it intends to present in other forums in litigating its long existing disputes with Cornerstone. There is no present ability of Debtor to reorganize as it does not have control of the broadcast license and concedes that this court lacks the authority to override the FCC's administrative determinations regarding control of a license that is comprehensively regulated by that federal agency. Without control of the license, Debtor has no business to conduct and no business to reorganize, notwithstanding the purported willingness of the new directors to loan Debtor money. To incur the expense of a Chapter 11 case without any present ability to reorganize and while continuing to incur debt, albeit debt that one prospective lender expressed a willingness to subordinate to all other debt, in order to present itself in a tactically better light in other forums is not a valid use of the reorganization provisions of Chapter 11. "The cases counsel that a Chapter 11 petition should not be used as a 'mechanism to orchestrate pending litigation.'" *In re Schur Mgmt. Co.*, 323 B.R. at 130 (quoting *Furness v. Lilienfield*, 35 B.R. 1006, 1013 (D. Md. 1983). Although

Debtor argued that "there very well may be" actions by parties that are not pursued without this court's exercise of bankruptcy jurisdiction, it does not specify the parties or the claims that it believes must be pursued in bankruptcy court rather than in state court.

As DeNune's state court sale will produce no distribution to Debtor's unsecured creditors, the beneficial bankruptcy purpose of a Chapter 11 bankruptcy case would be to pay their claims. The court thus finds it significant in evaluating the best interests of both Debtor and its creditors that none of Debtor's unsecured creditors have objected to dismissal of this or either of the other Chapter 11 cases filed by Debtor. *In re Forest Hill Funeral Home & Memorial Park-East, LLC*, Case No. 07-80056, 2007 Bankr. LEXIS 967, *46, 2007 WL 900280, *13 (Bankr. E.D. Okla. March 26, 2007).

Because there are alternative state and federal forums in which there are pending proceedings now materially advanced on the merits that will control whether reorganization is necessary or even possible, and because bankruptcy jurisdiction has now been invoked primarily as a litigation tactic rather than for the purpose of a business reorganization reasonably in prospect, and for all of the reasons discussed above, the court finds that it is in the best interests of both creditors and the Debtor that the court abstain from exercising its jurisdiction in this case. To the extent that Debtor is successful in state court and before the FCC, a Chapter 11 reorganization is still a possibility given Murry's testimony as to the existence of new, supportive investors or lenders. But under the current posture of the determinative legal proceedings pending in the other forums, that mere possibility is not enough to support the exercise of jurisdiction in this third bankruptcy case in less than a year.

A separate order granting Cornerstone's motion and dismissing this case under 11 U.S.C. § 305(a) will be entered by the court.